UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

JOSEPH R. JORDAN,                       :

       Plaintiff,                       :

       v.                               :

FEDERAL BUREAU OF PRISONS,              :
METROPOLITAN DETENTION CENTER,
METROPOLITAN CORRECTIONAL               :     **09-CV-08561 (LAP)**
CENTER,
USP-MARION,                             :
BRANDON WALLER,

       Defendants               :

--------------------------------X

## A M E N D E D   C O M P L A I N T

    Plaintiff Joseph R. Jordan ("Jordan"), pursuant to the
October 8, 2009 ORDER of the Honorable Loretta A. Preska,
hereby amends his complaint in the above-entitled action.[1/]

    I. Parties

       Joseph R. Jordan, Plaintiff, Pro Se
       60818-054
       USP-Marion
       P.O. Box 1000
       Marion, Il.  62959

---

    1/ See Docket entry 2.  (This "amended" complaint
replaces the original complaint.)

- 1 -

Federal Bureau of Prisons ("BOP"), Defendant(s)[2/]
320 1st. Street, N.W.
Washington, D.C.,  20534

Metropolitan Detention Center ("MDC"),
Defendant(s)
P.O. Box 329002
Brooklyn, N.Y.,  11232

Metropolitan Correctional Center ("MCC"),
Defendant(s)
150 Park Row
New York, N.Y.  10007

United States Penitentiary - Marion ("USP-Marion"),
Defendant(s)
P.O. Box 1000
Marion, Il.  62959

Brandon Waller ("Waller"), Defendant
last known place of work
Federal Bureau of Investigation
26 Federal Plaza, 23rd. floor
New York, N.Y.  10278

## II. Relevant Circumstances

(A)  Jordan was arrested on or about March 3, 2008 in
New York City, New York by law enforcement officers, including
Waller, and placed into the custody of the United States
Marshals.  (The U.S. Marshals placed Jordan in the custody
of the BOP at MDC on or about that same day.)

(B)  Between March 3, 2008 and on or about October 2,
2008, Jordan remained in the custody of the BOP at MDC.  On
or about October 2, 2008, Jordan was transferred within the
custody of the BOP from MDC to MCC.

(C)  Between on or about October 2, 2008 and on or about
September 22, 2009, Jordan remained in the custody of the BOP
at MCC.  On or about September 22, 2009, Jordan was transferred
within the custody of the BOP from MCC to MDC.

---

2/ "Defendant(s)" is intended to include the Bureau of
Prisons, the various institutions at which Jordan has been
and is housed at within the custody of the BOP, and the
departments and staff at those institutions.

- 2 -

(D)   Between on or about September 22, 2009 and on or about January 21, 2010, Jordan remained in the custody of the BOP at MDC.   On or about January 21, 2010, Jordan was transferred within the custody of the BOP to USP-Marion. Jordan remains at this time within the custody of the BOP at USP-Marion.

(E)   During the entire period of time that Jordan has been within the custody of the BOP, Jordan has not received any notice that he has been charged with violating any BOP policy or regulation.

III. <u>Statement of Claims</u>

A.   <u>As To Defendants BOP, MDC, MCC, and USP-Marion</u>

1. Defendants have refused and ignored Jordan's properly submitted requests for medical attention, and have provided inadequate medical attention, causing Jordan, inter alia, to suffer extreme emotional and physical pain and suffering, and doing so purposely and with deliberate indifference to his medical needs.

(a) <u>Re: MDC</u>

(1)   During on or between March 4, 2008 and October 2, 2008, Jordan gave proper notice to BOP medical staff at MDC that he was experiencing, inter alia, severe head and neck pain, dizziness, numbness in his limbs, pressure in his head, and altered perceptions (room spinning and the sensation that the floor was bouncing) that caused him to fall on several occasions.

(2)   Many of Jordan's medical requests (<u>See</u> ¶ A1(a)(1) above) included the caption: "EMERGENCY").   Jordan received no medical or other attention from MDC staff in

- 3 -

response to said requests.

    (3)  Jordan was not examined by a medical doctor at any time between the dates referred to in ¶A1(a)(1) above.  At some point, Jordan received a routine medical screening by a Physician's Assistant ("PA") which consisted of a series of questions and the taking of vital signs. Jordan made his complaints known to that PA at that time, and Jordan believed he would be scheduled to see a medical doctor.

    (4)  Between the dates referred to in ¶A1(a)(1) above, Jordan suffered severe emotional and physical pain and further injury by falling due to vertigo.  This pain and suffering was compounded by the fear aroused and frustration experienced as a result of the lack of medical attention. (On at least one occasion, Jordan was told by a MDC nurse that to get attention he would need to complain about "chest pain" or "difficulty breathing" or be "bleeding profusely".)

    (b) Re: MCC

    (1)  On or about October 2, 2008 (the date Jordan believes he arrived at MCC), Jordan notified the medical staff (during the routine screening) that he suffered from the symptoms identified in ¶A1(a)(1) above. Jordan also notified the Psychology staff of the same.

- 4 -

(2)   Between on or about October 2, 2008 and
on or about November 2, 2009, Jordan submitted numerous
proper medical requests complaining about the symptoms
referred to in ¶A1(a)(1) above, including reports that he
had fallen down and injured his head on several occasions
as a result of the symptoms.  (On several occasions, Jordan
was interviewed by the PA who entered Jordan's complaints
into an apparent computer data base.  Jordan informed the
PA that he had been scheduled for a neurological examination
prior to his incarceration, that the symptoms had "waxed
and waned" in the past, and were becoming more severe.)

(3)   While in custody at MCC, Jordan was not
examined by a BOP medical doctor.  Jordan continued to
experience the symptoms descibed in ¶A1(a)(1) above.  (On
or about October 15, 2008, Jordan wrote a letter to the
Honorable Judge Cote complaining, inter alia, about severe
dizziness.)[3]

(4)   In or about April 2009, Andrew Patel, Esq.
informed the legal department at MCC of Jordan's apparent
need to be examined by a neurologist.  (At that time,
Jordan was housed within the "Special Handling Unit" (SHU")
in "administrative segregation".)

---

3/ See Court Exhibits 6 & 8, U.S. v. Jordan, 08-Cr-0124
(S.D.N.Y. 2008)

- 5 -

(5)   On or about March 6, 2009 until some date in June 2009 (and for approximately 90 days), Jordan was held in SHU at MCC.  At no time preceding or during the SHU detention was Jordan accused of, charged with, or given a hearing with regard to any violation by Jordan of BOP or MCC policy, and at no time did Jordan request to be housed in SHU.

(6)   Jordan's placement and detention in the SHU was without sufficient reason, without due process, and constituted both cruel and inhumane punishment (of a pre-sentence prisoner), and an unfair and unconstitutional restriction on his right to access the court.

(7)   Despite facing trial on an untried matter and sentencing on another, Jordan was separated from his property, including most of his legal documents, limited to one telephone call per month, not permitted to use a writing pen, and without access to a law library.  (This situation prompted Andrew Patel, Esq. to inform Honorable Judge Cote that his ability to represent me was being significantly hindered.)

(8)   While in SHU at MCC, Jordan continued to complain about his pain and physical suffering both to medical staff and SHU staff, including complaining about the SHU policy that inmates' hands are bound behind the

- 6 -

back of the inmate before the cell door is opened to remove
the inmate for a visit.  This "policy" requires the inmate
to place both arms through a "tray slot opening" in the door
while leaning forward with his or her back to the door.  This
"policy" exacerbated the pain in Jordan's head and neck, and
on several occasions caused him to fall to the floor.  Jordan
reported this both verbally and in writing to MCC staff.
(Jordan also reported this to Honorable Judge Cote.)

(9)  For at least one month of the time that Jordan
was housed in the SHU at MCC, he was kept in a cell that had
a window so damaged that sunlight barely entered, a toilet
that constantly leaked maintaining about half-an-inch of
water on the floor, and a heating system so poor that the
temperature felt to be below 45$^{\circ}$.  Jordan complained almost
daily about these conditions, but suffered them for about
30 days before being moved into another cell.

(10)  At some point in or about May 2008, after
receiving the communication from Andrew Patel, Esq. referred
to in ¶A1(b)(4) above, Jordan was taken to a New York City
Neurologist by MCC staff.  A neurological examination
was performed, including a Magnetic Resonance Imaging ("MRI").

(11)  MRI results referred to in ¶A1(b)(10) above
evidenced that Jordan suffered from (a) a bulging disk in
his cervical spine, and (b) lesions on his brain.

- 7 -

(12)  During the period of confinement in SHU at MCC, in addition to the harsh conditions detailed in ¶1A(b)(9) above (which existed for a month), Jordan was subjected to other conditions significantly harsher than the conditions other inmates in "general population" were subjected to, including (a) 24-hour confinement in a closed cell (but for "rooftop recreation" for one hour, thrice per week, very early morning (which Jordan could not participate in given the pain and suffering caused to him by the SHU policy of restraining inmates with arms behind the back before opening cell doors [See ¶A1(b)(8) above]), (b) confinement to a cell with less than 32-square-feet of walking space, and (c) confinement in a SHU cell with another inmate

(13) On multiple occasions, via the appropriate inmate to staff request policy, and subsequent appeals to the BOP, Jordan reported his physical pain and suffering to MCC and BOP staff, and properly complained about the conditions in SHU and his resulting inability to prepare for proceedings in his criminal cases.  (Jordan received no responses to his complaints.)

(14)  In or about mid-June 2009, Jordan was removed from SHU at MCC to "general population" at MCC.  (This was presumably due to the MRI results that demonstrated that Jordan was suffering from the two physical conditions

- 8 -

referenced in ¶A1(b)(11) above.)

(15)   During July, August and September 2009, while in "general population" at MCC, Jordan made several proper complaints about his physical symptoms as described in ¶A1(a)(1) above without any response from MCC medical staff.  (On occasion when Jordan had contact with MCC medical staff in person, he reported his condition.)  Jordan was told by medical staff that there was nothing that could be done but to make note of the symptoms.)

(16)   Jordan received no treatment or medication while at MCC.

(17)   In or about August 2009, in an effort to put himself into a position where he could seek court intervention, Jordan moved the criminal court to allow him to represent himself, explained to Honorable Judge Cote that he was doing so primarily to obtain relief from the lack of treatment while at MCC, and requested to be examined by an independent neurologist.  Judge Cote allowed the requests.

(18)   In or about early September 2009, upon the direction of Judge Cote, Jordan was examined by an independent neurologist at MCC medical department (with an MCC staff nurse present).  The independent neurologist also evaluated Jordan's MDC and MCC medical file -- and then generated a report.

- 9 -

(19)   In or about early- to mid-September 2009, the independent neurologist referred to in ¶A1(b)(18) above generated a report ("report") that stated, inter alia, that Jordan's reported symptoms (as referred to in ¶A1(a)(1) above appeared to be genuine and were consistent with the MRI results (referred to in ¶A1(b)(11) above.)  The report further stated that further tests should be conducted to determine the course of treatment and rule out various neurological diseases, including recommending that (a) an examination be conducted by a neurosurgeon to determine whether or not immediate surgery is required, and (b) follow-up MRIs be conducted to determine whether the lesions on Jordan's brain are increasing in size.[4/]

(20)   On or about September 22, 2009, Jordan was transferred from MCC back to MDC.  In or about October 2009, MDC legal staff received a copy of the report referred to in ¶A1(b)(19) above from Andrew Patel, Esq. During this same period of time, Jordan made several com- plaints via the inmate request to staff policy with regard to his pain and suffering which was "getting worse."[5/]

_____

[4/]  On or about September 17, 2009, Jordan was replaced in SHU at MCC where he remained until transfer to MDC.

[5/]  Upon arrival at MDC, Jordan was placed in SHU where he remained for approximately ten days.  (He was not seen by a doctor upon arrival at MDC despite informing staff of his condition.)   - 10 -

(c) Re: MDC

(1)   Between on or about September 22, 2009 and January 21, 2010, Jordan remained at MDC.   During this period of time he received no medical attention until on or about January 20, 2010 when he received a chest x-ray. He was neither seen by a physician or PA at any time while at MDC despite having at least thrice informed staff of his pain and suffering, including on the intake form that all incoming inmates complete upon arrival at a facility within the BOP.   (Jordan was removed from MDC on January 21, 2010.)

(d) Re: BOP

(1)   Upon arrival at USP-Atlanta (Georgia) while in transit and FDC-Oklahoma Jordan notified medical staff both verbally and via the medical intake form referred to in ¶A1(c)(1) above of his pain and suffering.   (He was provided with a "Lower Bunk" medical order at both facilities, but no further medical attention.)

(e) Re: USP-Marion

(1) In or about late February 2010, Jordan arrived at USP-Marion and again notified medical staff both verbally and via the intake medical form of his need for treatment and his pain and suffering.

(2) Jordan has not to date been evaluated further as recommended by the report referred to in ¶A1((b)(19)

above.  (Jordan was seen by medical staff of unknown title in or about late March 2010.  Said staff ordered blood testing, and suggested that Jordan's pain and dizziness were the result of an ear problem.)

(3)  As a result of the inadequate medical attention, Jordan has been subject to severe pain and suffering for almost a year since the MRI results referred to in ¶A1(b)(11) above, and without the follow-up tests and evaluations recommended by the independent examination more than six months ago.  Jordan now suffes from what is persistent numbness in one limb and chronic pain in his upper back, lower back of his head and neck.  The other recurring syptoms described in ¶A1(a)(1) above have not subsided.

2. Defendants have violated Jordan's rights to due process, knowingly inflicted cruel and inhumane punishment, and intentionally acted to harm, and have harmed, Jordan by the placements in SHU at MCC as described in ¶¶A1(b)(5)-(9)&(12) above, and as described in ¶2(a) below. *

(a)  The conditions to which Jordan was subjected in SHU at MCC included a monitoring camera in his cell with no privacy at any time, including use of the toilet.

* Jordan was not given a hearing before or after his placement in SHU.

- 12 -

3. Defendants have denied Jordan, and others similarly situated, an adequately nutritious diet for an unreasonable amount of time, as the vegetarian" diet provided ("No Flesh Diet") is nutritionally deficient, and the no flesh" and "general" diets at MCC, USP-Marion, and other BOP facilities are significantly unhealthful in multiple respects.  The "Common fare" diet afforded "Muslims" is, in several respects, more nutritious and less unhealthful than all other diets offered.[6]

(a) Both the general and no flesh diets at MCC and USP-Marion are high in carbohydrates and refined, processed foods, and sugar, including, but not limited to white bread, gravies made with white wheat flour, white rice, white macaroni products, cakes, puddings and cookies.  (These foods subject Jordan, and others, to an inordinately high risk of health problems, including diabetes, heart disease and gastro-intestinal disorders.)[7]

(b) While Jordan makes no claim as to the inadequacy of caloric amount, in order to obtain an adequate caloric intake, an inmate must consume all food offered, including the unhealthful foods referred to in ¶3(a) above.

_____

6/ Whether the problem is with the dietary rules established by the BOP or due to disregard for those rules by institution staff is unknown to Jordan.

7/ Studies show that adult onset diabetes reduces one's life expectancy by ten years.

(c)   With particular respect to USP-Marion, the diet served to all inmates in the CMU (I-Unit) is extremely high in starch, sugars, and other carbohydrates that are converted to sugar when consumed, and significantly low in fresh, uncooked vegetables and fruits.✱

(d)   The no-flesh diet served at MDC, MCC, and USP-Marion (a diet offered to inmates for religious and other reasons) is significantly low in sources of essential nutrients and complete proteins, including Cobalamin (vitamin $B^{12}$), Vitamin A, and essential fatty acids.[8]

(e)   Inadequate amounts of the nutrients identified in ¶A3(d) above for an extended amount of time can cause irreparable damage to the body and brain, and premature death.[9]

---

[8] Vitamin $B^{12}$ is obtained from animal sources only, including liver, kidneys, other meats, fish, cheese, eggs, and milk.  Vitamin A is found in milk, cheese, egg yolk, liver and fish oil.  Fatty acids are derived from meats, nuts, eggs and avocadoes, among other foods.

[9] Vitamin $B^{12}$ deficiency may result in pernicious anemia and damage to the nervous system and intestinal tract.  Vitamin A deficiency may result in a heightened susceptibility to bacterial infection, and blindness. An inadequate intake of essential fatty acids has been linked to skin, heart, and neurological disorders.

- 14 -

✱ TO OBTAIN SUFFICIENT CALORIES, JORDAN IS FORCED (BY HAVING NO ALTERNATIVES) TO CONSUME FOODS WITH ADDED SALT AND/OR SUGAR, FRIED FOODS, CAKES, WHITE BREAD, AND COOKIES, AND THIS HAS DAMAGED AND THREATENS TO FURTHER DAMAGE HIS HEALTH,

(f) Jordan has repeatedly utilized the BOP grievance process, including communications directly to BOP in an effort to either receive the nutritionally adequate diet he assumes is mandated by BOP policy or effect a change from the inadequate diet to an nutritionally adequate one.  (Jordan has never received a response from any defendant or staff member within the BOP.[10/])

B.  <u>As To Defendant Brandon Waller</u>

1.  Waller acted under color of law -- as an agent of the Federal Bureau of Investigation -- to seize certain items (documents, computer equipment, and other tangible items) from a building where Jordan had property stored, seizing items with no relation to any alleged criminal act, refusing to return them despite dismissal of the criminal complaint that Waller relied upon, and acted to ensure that Jordan lost property that was not seized.

(a)  On or about February 11, 2008, Waller executed a search warrant issued on the basis of his affidavit which included materially false statements.

_____

10/ The inadequacy of the BOP diet is not likely attributable to budgetary considerations:  The service of healthier, less cooked, simpler foods would no doubt reduce preparation expenses, and significantly reduce health care costs.  Jordan presently suffers from nerve damage, an undiagnosed neurological disorder, and vision problems.

On that date, Waller, and others at his direction, seized, inter alia, numerous documents, computer equipment, books, electronics and other items (a significant portion of which belonged to Jordan) from 2773 Reservoir, Bronx, New York 10468, second floor.

(b)   The items seized included numerous items not identified on the search warrant, and, numerous items never used in any court proceeding.  Jordan, and others acting for him have made multiple requests for the return of these items from Waller.

(c)   Between February 11, 2008 and at least September 1, 2009, Waller -- on several occasions -- told family and other associates of Jordan that they could not visit 2773 Reservoir to retrieve Jordan's property that was not seized by Waller, and that they would be in violation of the law if they attempted to.  Waller's actions in this regard were performed under the color of law but not in conformance with any law or policy of his employer.[11]

(d)   As a result of Waller's actions as purposely harmful and corrupt described in ¶B1(c) above, Jordan has lost invaluable personal items (film, video tapes, photographs, letters), clothing, appliances, furniture and other items of value not less than $20,000 USD.

_____

11/ 2773 Reservoir is a rental property not owned by Jordan.  WALLER ACTED KNOWING THAT HE WAS VIOLATING FBI POLICY, THE LAW, AND/OR THAT HE WAS ACTING WRONGFULLY WITH THE PURPOSING OF HARMING JORDAN.

IV.  Relief Requested

    A. Re: MDC, MCC, USP-Marion & BOP

        (1)  Unspecified punitive and compensatory damages, and other relief deemed appropriate, for the unlawful and unconstitutional confinement in SHU at MCC.

        (2)  Unspecified punitive and compensatory damages, and other relief deemed appropriate, for the deliberate indifference to Jordan's medical needs.

        (3)  An order that the BOP act on the recommendations of the independent neurologist as described in ¶A1(b)(19) above.

        (4)  An order that the BOP and its staff are not to, absent exigent circumstances, restrain Jordan's arms behind his back.

        (5)  An order that Jordan be provided with a means to obtain (at his own expense) non-prescription nutritional supplements recommended by natrual health professionals to prevent neurological damage and abate symptoms associated with neurological disorders, including the nutritional supplements (a) DHA, (b) Glutathione, (c) L-Carnitine, (d) Co-Q-10, and (e) Vitamin B complex.

        (6)  The appointment of an independent certified dietician to both evaluate the BOP published general and "no-flesh" diets and investigate to ensure that

- 17 -

a nutritionally adequate no-flesh diet, and a diet that does not put Jordan, or other inmates similarly situated, at risk of diabetes or other serious ailments.

(7)  An order that the BOP, if it continues to offer unhealthful foods (cakes, white bread, gravies) to inmates, offers such only as alternatives to other healthful choices (fruit, whole grain breads, and uncooked vegetables). And does not effectively force an inmate to consume the unhealthful foods in order to obtain sufficient calories.

(8)  Such further relief and order(s) as the Court deems necessary following receipt of a report from an independent certified dietician, to specifically include an evaluation of the "no-flesh" diet served at USP-Marion.

B.  Re: Waller

(1)  Unspecified punitive and compensatory damages, and other relief deemed appropriate, with respect to the loss of property from 2773 Reservoir, Bronx, New York  10468, that was not seized by Waller, but, nevertheless lost due to his actions under the color of law.

(2)  An order directing Waller to state with specificity each item seized from the address referred to in ¶B(1) above (this page), whether the item is subject to continual seizure, and the reason for not re-

turning it as requested.

   (3) An order directing Waller to return
each item that the Court (after reviewing his response per
the order requested in ¶B(2) above, previous page) rules
is unlawfully seized or unnecessarily seized.[12/]

           Respectfully submitted,
           By and for Plaintiff,

           Joseph R. Jordan
           60818-054
           P.O. Box 1000
           Marion, Il.  62959

          April 5, 2010
          This 19 page Amended
          Complaint is Being Placed
          Into The Hands of a "Unit
          Team" Member For I-Unit
          At USP-Marion, Postage
          Pre-Paid, on April 5, 2010
          (Fifth Day of April, 2010)
          As Legal Mail.

---

12/ Jordan has no pending criminal case.